ACCEPTED
08-17-00106-CR
EIGHTH COURT OF APPEALS
EL PASO, TEXAS
5/29/2018 1:34 PM
DENISE PACHECO
CLERK

**NO. 08-17-00106-CR**

# IN THE COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS

FILED IN
8th COURT OF APPEALS
EL PASO, TEXAS
5/29/2018 1:34:19 PM

DENISE PACHECO
Clerk

**LEO MARTINEZ**                                         **APPELLANT**

**V.**

**THE STATE OF TEXAS**                                   **APPELLEE**

## THE STATE'S BRIEF

## ON APPEAL FROM CAUSE NUMBER 20120D01991
## IN THE 409TH DISTRICT COURT OF EL PASO COUNTY, TEXAS

**JAIME ESPARZA**
**DISTRICT ATTORNEY**
**34th JUDICIAL DISTRICT**

**REBECCA ESTRADA QUINN**
**ASST. DISTRICT ATTORNEY**
**DISTRICT ATTORNEY'S OFFICE**
**EL PASO COUNTY COURTHOUSE**
**500 E. SAN ANTONIO**
**EL PASO, TEXAS 79901**
**(915) 546-2059 ext. 4320**
**FAX (915) 533-5520**
**E-MAIL: rebquinn@epcounty.com**
**SBN 00787444**
**ATTORNEYS FOR THE STATE**

**The State does not request oral argument.**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES     iii-iv

STATEMENT OF THE CASE     v

STATEMENT OF FACTS     1-10

SUMMARY OF THE STATE'S ARGUMENTS     11-12

**STATE'S REPLY TO APPELLANT'S SOLE ISSUE PRESENTED**

    **Martinez failed to show that the trial court erred by refusing his**    13-26
**request to provide the jury with an instruction on the lesser-included offense of manslaughter because the trial evidence did not support giving such an instruction where, other than his assertions that he had not intended to murder his mother and that he accidentally shot her, there was no evidence in the record that showed that at the time that he fired the gun, he was aware of, but consciously disregarded, a substantial and unjustifiable risk that his mother would die as a result of his conduct. Moreover, the evidence showed that he intentionally and knowingly caused his mother's death when, after arguing with her over his drinking, he pointed a cocked and loaded gun at her and shot her in the face as she turned to say something to him.**

PRAYER     27

SIGNATURES     27

CERTIFICATE OF COMPLIANCE     27

CERTIFICATE OF SERVICE     27

# INDEX OF AUTHORITIES

## FEDERAL CASES

*Miranda v. Arizona*, 384 U.S. 436,
86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ........................................................................6

## STATE CASES

*Arnold v. State*, 234 S.W.3d 664
(Tex.App.-Houston [14th Dist.] 2007, no pet.)........................................................18

*Brown v. State*, No. 04-12-00813-CR, 2014 WL 3747234
(Tex.App.-San Antonio July 30, 2014, no pet.)
(not designated for publication) ..........................................................................23, 25

*Cantu v. State*, No. 04-07-00330-CR, 2008 WL 372506
(Tex.App.-San Antonio Aug. 20, 2008, pet. ref'd)
(not designated for publication) ...............................................................................24

*Cavazos v. State*, 382 S.W.3d 377 (Tex.Crim.App. 2012) ....................15, 16, 20, 23

*Gilbert v. State*, 196 S.W.3d 163
(Tex.App.-Houston [1st Dist.] 2005, pet. ref'd)..................................................19, 26

*Goad v. State*, 354 S.W.3d 443 (Tex.Crim.App. 2011)...........................................14

*Godsey v. State*, 719 S.W.2d 578 (Tex.Crim.App. 1986)............................. 18, 20, 21

*Hall v. State*, 225 S.W.3d 524 (Tex.Crim.App. 2007) ............................................15

*Hampton v. State*, 109 S.W.3d 437 (Tex.Crim.App. 2003).....................................15

*Hayes v. State*, 728 S.W.2d 804 (Tex.Crim.App. 1987)..........................................19

*Keller v. State*, No. 03-13-00501-CR, 2014 WL 6617143
(Tex.App.-Austin Nov. 20, 2014, no pet.)
(not designated for publication) ...............................................................................24

*Mathis v. State*, 67 S.W.3d 918 (Tex.Crim.App. 2002) ...........................................22

*Sanchez v. State*, No. 05-05-01118-CR, 2006 WL 2709528
(Tex.App.-Dallas June 6, 2007, pet. ref'd)
(not designated for publication) ...............................................................................26

*Scepanski v. State*, No. 13-11-00523-CR, 2014 WL 4161453
(Tex.App.-Corpus Christ Aug. 21, 2014, no pet.)
(not designated for publication) ...............................................................................19

*Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922
(Tex.App.-El Paso Oct. 21, 2015, no pet.)
(not designated for publication) .....................................................................16, 18, 20

## STATUTES AND RULES

TEX. PENAL CODE §6.03(a) ........................................................................................15

TEX. PENAL CODE §19.02(b)(1) .................................................................................13

TEX. PENAL CODE §19.02(b)(2) .................................................................................13

TEX. PENAL CODE §19.04(a) ......................................................................................15

# STATEMENT OF THE CASE

Appellant, Leo Martinez (hereinafter Martinez), was indicted for the murder of his mother, Hilda Gonzalez (hereinafter Gonzalez). (CR:8).[1] A jury found Martinez guilty as charged in the indictment. (RR4:56)(CR:78). Martinez elected to have the jury assess punishment, and the jury assessed his punishment at life in the Texas Department of Criminal Justice Institutional Division and a $10,000 fine. (CR:91)(RR6:4). The trial court sentenced Martinez in accordance with the jury's verdicts. (RR6:9). Martinez filed an application for writ of habeas corpus claiming that through no fault of his own, he had been denied the right to a direct appeal, and the Court of Criminal Appeals ordered that he be granted the opportunity to file an out-of-time appeal. (SRR1:5). Martinez timely filed notice of appeal pursuant to the opinion of the Court of Criminal Appeals. (CR:124-25).

---

[1] Throughout this brief, references to the record will be made as follows: references to the clerk's record will be made as "CR" and page number, references to the originally filed reporter's record will be made as "RR" and volume and page number, references to the first supplemental reporter's record will be made as "SRR" and volume and page number, and references to exhibits will be made as either "SX" or "DX" and exhibit number.

## STATEMENT OF FACTS

**Introduction**

In 2005, one week after his high-school graduation, Martinez enlisted in the Marines, and just three days shy of graduating from boot camp, he was dishonorably discharged for testing positive for cocaine. (RR5:36-37). Martinez spent the next four years in Denver living with and near his father. (RR5:39-43). In 2007, he rekindled a high-school friendship with Stephanie Paniagua (hereinafter Paniagua) that ultimately formed into a romantic relationship. (RR5:39-40). After Paniagua obtained a job transfer, she moved from El Paso to Denver to live with him, and they had a daughter. (RR5:39-40). In 2009, Martinez was arrested for menacing, abusive language or threats, and creating danger of violence against Paniagua. (RR5:69). Martinez and Paniagua ended their relationship after being together for two years, and she moved to Alaska with their daughter. (RR5:41). Martinez remained in Denver and, in 2010, was arrested for assault against a current girlfriend. (RR5:42). In July 2011, he asked his mother if he could return home to live with her in El Paso because he was fed up with his abuse of alcohol and drugs. (RR5:43). Although his mother was attempting to regroup her own life after suffering from a lupus flare-up, she took him in and offered him support. (RR4:68), (RR5:44).

Once back in El Paso, Martinez was not working, but he had enrolled in school in order to become a massage therapist. (RR5:44). He claimed that things were going well at first, but then in September 2011, he was arrested for driving while intoxicated (DWI). (RR5:44-45). His mother bailed him out and was very upset with him because he had promised her that he would stop drinking and this was his second DWI. (RR5:46). After his arrest, Martinez continued to drink alcohol, and his relationship with his mother deteriorated because she found his continued drinking upsetting. (RR5:47).

**The murder**

On February 5, 2012, the tension between Martinez and his mother escalated when she, tired of his drinking, told him to leave her house. (SX134, 10:33). Martinez began packing and, unbeknownst to his mother, decided to pack a gun that belonged to her boyfriend, Mariano Peralta (hereinafter Peralta). (SX134, 17:25). However, his packing was interrupted when his mother suggested that they postpone his departure due to his upcoming DWI hearing, as she was responsible for his posted bail. (SX134, 17:39).

Martinez then took Peralta's gun and walked to Love's Truck Stop, which was about two miles from his mother's house. (SX134, 18:24). Once he was there, he sat down to drink a beer and watch the Super Bowl game. (SX134, 2:10). About five minutes before the game ended, he returned to his mother's house and

2

stood outside for about half an hour "scoping" his mother's "every move." (SX134, 19:57). His mother was unable to see him watching her because he was shielded by a fence. (SX134, 20:07). Martinez eventually went inside and approached his mother, who was sitting down doing homework. (SX134, 19:47). He stated that she "nagged" him about his drinking, and she asked what he was doing back, as she thought he had left for good. (SX134, 38:22). After they argued, his mother spoke with her best friend on her cell phone, and when she hung up and was about to call someone else, he told her that he needed to use the phone "as a decoy to get her off the phone." (RR5:90), (SX134, 23:24). His mother gave him the phone and asked him not to be long. (SX134, 22:26). She then walked into her bedroom, and he took Peralta's gun, which he had previously cocked and loaded, and followed her. (SX134, 23:58). When she got to her bedroom, he was standing in the hallway, and as she turned to look at him, he shot her in the face. (SX134, 25:05), (RR4:19). Martinez stated that when she turned around, "she was about to say something—not no more." (SX134, 25:05). He claimed not to know why he shot her, but after doing so, he looked at her once and knew that it was too late to get her any help. (SX134, 25:06).

**Martinez's actions after the murder**

Martinez left home in Peralta's truck and stopped at Love's Truck Stop for gas and to buy a 30-pack of beer. (SX134, 26:11, 26:50). He used his mother's

cell phone to call his younger brother, but was not able to get a hold of him. (RR5:86). He also called a friend living in Hatch, New Mexico, and asked her if they could meet in El Paso, as he did not want to go to her home for fear of being caught at the border-patrol checkpoint. (SX134, 27:11). However, she was unable to leave her home due to the late hour. (SX134, 27:40). He then called Paniagua and was on the phone with her for close to an hour. (RR5:91), (SX134, 26:00), (SX259).

Paniagua was at her home in California with her daughter when she received Martinez's call, which was unexpected because they were not on speaking terms. (RR3:44-45). Paniagua believed that Martinez sounded as though he was drunk and repeatedly asked him what was wrong, before finally asking him if he had killed someone. (RR3:45). Martinez responded that if he answered her, he could not reveal who he had killed. (RR3:46). She then ran through a list of those he might have killed, including his mother, her boyfriend, his dog, or a stranger, before he admitted that he killed his mother. (RR3:46). Paniagua did not believe him and asked him not to joke about something like that, but he told her that he was not joking. (RR3:46). Martinez explained that he shot his mother after they argued about his failure to be a good father and then described the bloody scene. (RR3:47). He also kept repeating that he could not believe what had happened. (RR3:62). Although Paniagua testified that Martinez told her that shooting his

4

mother had been an accident or a mistake, she admitted that she never said this when the police initially spoke to her. (RR3:52). She also agreed that Martinez's statement that he could not believe what had happened was different from him saying that he accidently shot his mother. (RR3:53).

Paniagua and Martinez continued to speak while he drove around, and he eventually stopped at a Motel 6. (RR3:48). She remained on the phone with him while he spoke with the Motel 6 desk clerk, who turned out to be a high-school classmate. (RR3:49). After speaking with the desk clerk, he walked out and told her that there were officers standing by the truck. (RR3:49). She advised him to act normally, and as he approached the officers, they asked for his name and then arrested him. (RR3:49).

**The 911 call and police response**

While Paniagua was speaking with Martinez, she texted several people in an effort to get someone to go check on Gonzalez, and the only person who responded was Jesus Solorio (hereinafter Solorio). (RR3:50). Solorio received Paniagua's urgent texts asking him to call 911 in order obtain assistance for Martinez's mother. (RR3:30),(SX6-16). Although Solorio was in disbelief, he called 911 to report that Paniagua was on the phone with Martinez, who had informed her that he had shot his mother and wanted to kill himself. (RR3:31), (SX17, 18). After Solorio made the initial 911 call, the police called him back to obtain more details,

5

and his information that Martinez was on his way to Motel 6 led to Martinez's apprehension. (SX12). Solorio's 911 call also prompted officers to respond to Gonzalez's home, where after knocking and receiving no response, they broke down the front door and found Gonzalez in a room towards the back of the house lying on the floor in a pool of blood. (RR3:70-73). Because Gonzalez showed no signs of life and foul play was suspected, detectives with the El Paso Sheriff's Office (EPSO) were called out to the scene. (RR3:74-75).

Detective Antonio Arias (hereinafter Detective Arias) responded to Gonzalez's home after he received information that a female, Gonzalez, was found dead and was believed to have been killed by her son, Martinez, who had been arrested at the Motel 6. (RR3:79-80). When he arrived at the scene, he spoke with other detectives, and when the crime-scene technicians arrived, he went to headquarters to speak with Martinez. (RR3:80).

**Martinez's video-recorded statement**

Martinez agreed to give a video-recorded statement that was admitted into evidence without objection, (RR3:81), (SX134), and before questioning began, Detective Arias read him his *Miranda*[2] warnings. (RR5:228). Martinez first asked how they knew that he was at the Motel 6 and, after deducing that Paniagua had called them, stated that her doing so was "f***** up." (SX134, 1:58). He then

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tried to implicate Peralta by stating that he had been with him in the truck when they stopped at the Motel 6. (SX134, 5:36, 7:14). As the interview continued, Martinez explained that he had lived with his mother since July of 2011 and that after arguing with her the prior afternoon about his drinking, she had kicked him out of her house. (SX134, 28:41). He began to pack his suitcase so that he could leave and threw in a gun that he had found in a closet and belonged to his mother's boyfriend, Peralta. (SX134, 16:26). However, he stopped packing when his mother suggested that he wait to leave until after his DWI court hearing scheduled for the next week, given that she had posted his bail and was responsible for his appearance. (SX134, 17:13).

Martinez then walked over to Love's Truck Stop, taking Peralta's gun with him, and watched the Super Bowl game. (SX134, 18:24). Prior to the end of the game, he walked back to his mother's house, and when he arrived, he stood outside for about half-an-hour listening to music and "scoping" his mother's "every move." (SX134, 9:09, 19:57). His mother was in her room doing homework and could not see him because a fence was blocking her view. (SX134, 20:07). He admitted that he "just got there knowing what he was going to do." (SX134, 19:53). When he went inside, his mother was still sitting down doing her homework, and he sat down in front of her. (SX134, 19:47). She asked him why he had been drinking and said that she thought he had left the house for good.

(SX134, 21:05). Martinez stated that the arguments with his mother regarding his failure to face his problems arose when he drank and that if she "just accepted that he drank, then things would go smoothly." (SX134, 11:29).

His mother spoke with her best friend, Maria Dominguez, on her cell phone, and after she hung up, they argued some more. (SX134:37:49). She then walked away and was about to dial a number on her cell phone when he asked to use it "as a decoy" in order "to get her off the phone." (RR3:114), (SX134, 23:24, 38:00). She handed him her cell phone, asking him not to be long, and then went to her bedroom. (SX134, 22:26). Martinez followed her with the cocked and loaded gun in his hand and was in the hallway when she got to her bedroom. (SX134, 23:58). His mother turned to look at him and was about to say something, but before she could do so, he shot her. (SX134, 25:05). He "looked at her once, but knew that it was too late." (SX134, 25:05).

Martinez said that he left in Peralta's truck and thought about going to see a friend in Hatch, New Mexico, but decided not to because he did not want to risk traveling through the border-patrol checkpoint. (SX134, 26:11). While driving around, he called Paniagua to tell her what he had done and to speak with his daughter. (SX134, 26:11). He did not think that she would call the police and reiterated his dismay with her due to her role in his apprehension. (SX134, 26:11).

8

Martinez stated that he did not know why he shot his mother. (SX134, 19:07). However, he also said that her "nagging started as soon as he went in" and that "he just couldn't hold back. I don't know. It's weird." (SX134, 38:19). He admitted that there was tension between them, but that it was no reason for him to have done what he did and said that they should have sat down and talked about things. (SX134, 30:44).

**Cause of death**

Dr. Contin performed Gonzalez's autopsy and testified that she died of a bullet hole to the head. (RR4:27). He stated that the bullet entered her right cheek, passed into the carotid artery, and then to the neck where it was recovered. (RR4:19-20). He further explained that Gonzalez died from respiratory arrest, as her breathing stopped when the bullet hit her cervical spine. (RR4:27). He found no other injuries on her that were indicative of a struggle. (RR4:20, 29).

On cross examination, Dr. Contin testified that Gonzalez's death was instantaneous and that medical treatment would not have made a difference. (RR4:28-29).

The jury found Martinez guilty of murder, rejecting his claim that his actions were reckless because he had not planned to murder his mother. (RR4:47, 56).

9

**Punishment**

The jury heard testimony that Gonzalez's family was greatly affected by her death. (RR4:66, 97). They also learned that after Gonzalez recovered from lupus, she enrolled in school in order to become a nursing assistant. (RR4:68-69). The State also introduced evidence of Martinez's criminal history in Colorado and photos of him laughing with the Motel 6 desk clerk a few hours after he had murdered his mother. (SX231, 232, 233), (SX237-244).

Martinez testified that from the time that he was a child, his mother would hit him for not doing his chores correctly and tell him that she did not want him in her life. (RR5:31-32). He claimed that on the day of his mother's murder, he snapped because she told him he was nothing but a drunk and that Paniagua did not want him and would find someone else who might sexually abuse his daughter. (RR5:61-63).

The jury rejected Martinez's claim that he caused his mother's death under the immediate influence of sudden passion and sentenced him to life in prison and a $10,000 fine. (RR6:4).

10

## SUMMARY OF THE STATE'S ARGUMENTS

**Summary of the State's reply to appellant's sole issue:** In his sole issue, Martinez claims that the trial court erred by not providing a jury instruction on the lesser-included offense of manslaughter. The trial court correctly refused Martinez's request because the evidence at trial did not support providing such an instruction. Martinez argues that statements he made indicating that shooting his mother was an accident, that he did not intend to shoot her, and that he could not take back his actions are evidence that he recklessly caused her death. However, there is no evidence that Martinez accidentally discharged the gun, during, for example, a struggle with his mother, or that he only shot towards her in an attempt to scare her. Additionally, the statements he relies upon are merely expressions of regret and do not support an inference that he consciously disregarded a known risk when he shot his mother. Martinez also asserts that Dr. Contin's testimony regarding the various ways that homicide could be charged also supports his position. However, Dr. Contin did not testify that Martinez consciously disregarded a known risk when he shot his mother, and his testimony that homicide could be charged as murder, manslaughter, or criminally negligent homicide does not support that inference.

Thus, the evidence cited by Martinez did not show that at the time that he fired the gun, he was aware of, but consciously disregarded, a substantial and

11

unjustifiable risk that his mother would die as a result of his conduct. Additionally, it does not rebut or negate the evidence that he intentionally and knowingly caused his mother's death, where the evidence shows that after what he described as his mother "nagging" him about his drinking, he took a cocked and loaded gun, pointed it at her, and shot her in the face.

**REPLY TO APPELLANT'S SOLE ISSUE:** **Martinez failed to show that the trial court erred by refusing his request to provide the jury with an instruction on the lesser-included offense of manslaughter because the trial evidence did not support giving such an instruction where, other than his assertions that he had not intended to murder his mother and that he accidentally shot her, there was no evidence in the record that showed that at the time that he fired the gun, he was aware of, but consciously disregarded, a substantial and unjustifiable risk that his mother would die as a result of his conduct. Moreover, the evidence showed that he intentionally and knowingly caused his mother's death when, after arguing with her over his drinking, he pointed a cocked and loaded gun at her and shot her in the face as she turned to say something to him.**

## UNDERLYING FACTS

In addition to the recitation of facts set out in the statement of facts above, the record in this case further shows that Martinez was charged by indictment with two manners and means of committing murder. First, under TEX. PENAL CODE §19.02(b)(1), with intentionally and knowingly causing the death of Gonzalez by shooting her in the face with a firearm. (CR:8). And, alternatively, under TEX. PENAL CODE §19.02(b)(2), with causing Gonzalez's death by intending to cause serious bodily injury to Gonzalez and committing an act clearly dangerous to human life by shooting her in the face with a firearm. (CR:8).

During voir dire, defense counsel spoke to the jury about manslaughter and criminally negligent homicide, calling them lesser-included offenses of murder, and told them that if selected, they would be responsible for determining which of those offenses Martinez was guilty of. (RR2:86). During the jury-charge conference, Martinez argued that he was entitled to a lesser-included-offense

13

instruction on manslaughter because, in his video-recorded statement, he claimed that he had not planned his mother's murder and could not take back what he did. (RR4:32).[3]  The trial court denied this request, finding that there was not a scintilla of evidence to warrant such an instruction.  (RR4:33).

During closing argument, Martinez argued that he had not intended to kill his mother based on his statements that he had not planned her murder, that the murder had just happened, and that he could not take back what he had done. (RR4:47, 49).

## ARGUMENT AND AUTHORITIES

In his sole issue, Martinez contends that the trial court's charge to the jury was erroneous because it did not include the lesser-included offense of manslaughter.  *See* (appellant's brief:17-25).  Martinez's claim is without merit and should be overruled because there was no evidence presented to the jury that he consciously disregarded a known risk when he shot his mother.

## I.  Principles applicable to the submission of a lesser-included-offense instruction

The determination of whether a lesser-included-offense instruction requested by a defendant must be given involves a two-step analysis.  *Goad v. State*, 354 S.W.3d 443, 446 (Tex.Crim.App. 2011).  The first question is whether the offense

---

[3] The record reflects that Martinez also argued that he was entitled to a lesser-included-offense instruction on criminally negligent homicide based on the same reasons given for the manslaughter instruction.  (RR4:32).  Martinez does not complain in this appeal about the trial court's denial of his request for an instruction on criminally negligent homicide.

14

in the requested instruction is a lesser-included offense of the charged offense. *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex.Crim.App. 2007). If it is, then a determination must be made as to whether there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense. *Id.* In the second step of the analysis, anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Id.* at 536. And the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Id.* However, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Hampton v. State*, 109 S.W.3d 437, 441 (Tex.Crim.App. 2003). "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex.Crim.App. 2012).

A person commits the offense of manslaughter if he "recklessly causes the death of an individual." TEX. PENAL CODE §19.04(a). A person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL CODE §6.03(a).

15

Thus, in order for Martinez to have been entitled to an instruction on manslaughter, the record had to contain "some affirmative evidence" that he did not intend to cause his mother's death, thereby allowing a rational jury to find him not guilty of murder. *See Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922 at *9 (Tex.App.-El Paso Oct. 21, 2015, no pet.)(not designated for publication). And, there had to be "some affirmative evidence" from which a rational juror could have concluded that he had the lesser mental state required for manslaughter, *i.e.*, that he acted recklessly in conscious disregard of an unjustifiable risk that his conduct would cause his mother's death. *See Shannon*, 2015 WL 6394922 at *9, *citing Cavazos*, 382 S.W.3d at 385.

As a legal matter, manslaughter is a lesser-included offense of murder. *See Cavazos*, 382 S.W.3d at 384. Thus, the pivotal inquiry in this case is whether the trial evidence supported giving the instruction to the jury.

## II. The trial court properly refused to provide an instruction on manslaughter because the trial evidence did not support giving such an instruction.

In order for Martinez to prevail on his claim that the trial court erred by failing to grant his request for a jury instruction on manslaughter, there must have been "some affirmative evidence" that he did not intentionally and knowingly intend to kill or cause serious bodily injury to his mother, thereby allowing a rational jury to find him not guilty of murder. *See Shannon*, 2015 WL 6394922 at

16

\*9.  And, there had to have been "some affirmative evidence" from which a rational jury could have concluded that he acted recklessly in conscious disregard of an unjustifiable risk that his conduct would cause his mother's death.  *See Shannon*, 2015 WL 6394922 at \*9.  In attempting to meet this standard, Martinez relies on the following:  1) Paniagua's testimony that Martinez allegedly told her that shooting his mother was a mistake or an accident, 2) Detective Arias' testimony that during his video-recorded statement, Martinez said that he had not planned to murder his mother and that he could not take back his actions, and 3) Dr. Contin's testimony that homicide could be classified as either murder, manslaughter, or criminally negligent homicide.  *See* (appellant's brief:17-18).  Martinez fails to meet this standard with the evidence he relies upon because neither the statements nor Dr. Contin's testimony reflect that his culpable mental state was merely reckless (or anything less than intentional or knowing) when he discharged the gun.

> **A.  Paniagua's testimony regarding Martinez's alleged assertion that he accidentally shot his mother is an isolated claim that is unsupported by the evidence.**

At trial, the prosecutor asked Paniagua whether Martinez told her that shooting his mother had been a mistake or an accident, and she responded that he had.  (RR3:52).  However, when questioned further about this, Paniagua admitted that when she gave her statement to the police, she did not mention that Martinez

17

characterized his actions as a mistake or an accident. (RR3:52). Instead, she stated that Martinez initially told her that he could not tell her what had happened because he could not believe it himself, and then he continued to repeat that he was in disbelief. (RR3:52-53, 62).

Paniagua's testimony regarding Martinez's claim that he accidentally shot his mother cannot be considered in a vacuum. *See Godsey v. State*, 719 S.W.2d 578, 584 (Tex.Crim.App. 1986); *Shannon*, 2015 WL 6394922 at *9. Rather, the entire record must be examined and in reviewing the entire record, there is no evidence that supports Martinez's claim of mere recklessness. *See Shannon*, 2015 WL 6394922 at *9-10. Generally, in cases where a defendant is accused of murder by shooting the victim, courts require that a manslaughter instruction be given when there is some showing that the gun discharged accidentally or that the defendant was simply trying to scare the victim. *See Arnold v. State*, 234 S.W.3d 664, 672 (Tex.App.-Houston [14th Dist.] 2007, no pet.)("[C]ourts have typically found that a manslaughter instruction was required based on some evidence that the gun discharged accidentally or that the defendant only intended to frighten the complainant.").

In his video-recorded statement, Martinez did not mention any facts that would have shown that he was reckless in discharging the gun, such as engaging in a struggle with his mother, stating that the gun discharged accidently, or claiming

18

that he only shot towards his mother in order to scare her. Additionally, Dr. Contin's testimony that there were no signs of injury on Gonzalez supports the inference that no struggle occurred. (RR4:20, 29). Thus, the record does not contain any evidence of the type that generally requires a trial court to instruct the jury on manslaughter in a shooting death. *See Scepanski v. State*, No. 13-11-00523-CR, 2014 WL 4161453 at \*5 (Tex.App.-Corpus Christ Aug. 21, 2014, no pet.)(not designated for publication), *citing Hayes v. State*, 728 S.W.2d 804, 810 (Tex.Crim.App. 1987)(holding that the exact circumstance under which a manslaughter charge should be given is one in which the defendant claims that he did not intend to shoot the victim and that the gun accidentally discharged during a struggle with the victim); *Gilbert v. State*, 196 S.W.3d 163, 165 (Tex.Crim.App. 2005)(holding that because manslaughter is a "result-of-conduct" offense, it was important for appellant, claiming that the trial court erred in refusing to submit a manslaughter instruction, to rely on facts showing he was reckless in discharging the gun, such as claiming that he voluntarily discharged the gun in an effort to shoot near the complainant in order to scare him).

Moreover, Martinez's alleged claim that shooting his mother was an accident, would not rationally support a finding that he acted recklessly. In his video-recorded statement, Martinez stated that he got to his mother's house knowing what he was going to do, that he lied about needing to use his mother's

19

cell phone so that he could get her off the cell phone, that Gonzalez was simply standing in her bedroom and had turned to say something to him when he took the cocked and loaded gun and shot her, and that he left the scene without obtaining assistance for his mother, later telling Paniagua that he could not believe what he had done. (SX134, 19:07, 23:24, 23:58, 25:05, 26:11). Thus, his admitted actions did not support the inference that he consciously disregarded a known risk when he shot his mother, but, rather, that he knowingly and intentionally caused her death. *See Cavazos*, 382 S.W.3d at 385 (holding that "[P]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that appellant acted recklessly at the moment he fired the shots."); *Godsey*, 719 S.W.2d at 580-81 (holding that if a deadly weapon was used in a deadly manner, the inference is almost conclusive that defendant intended to kill).

Similarly, as this Court explained in *Shannon*, when evidence shows that a defendant committed an act that was "clearly dangerous to human life," such as shooting a victim with a firearm, recklessness is not raised simply by defendant's statement that he did not mean to do it. *See Shannon*, 2015 WL 6394922 at *9-10. Here, Martinez admitted that he took a gun and shot his mother, and the evidence established that she died from a gunshot wound to the head. (SX134, 25:05), (RR4:27). As such, because Martinez committed an act that was "clearly

20

dangerous to human life," his request for a manslaughter instruction was not warranted, despite his claim that it was an accident. *See Shannon*, 2015 WL 6394922 at *9. ("[N]umerous courts have held that when the record demonstrates a defendant committed an act that was "clearly dangerous to human life," such as shooting a victim at point blank range or stabbing a victim in the throat, the evidence will not rationally support a finding that the defendant acted recklessly or negligently, even in light of the defendant's testimony that he did not intend to kill his victim.").

Thus, Martinez's statement to Paniagua that it was an accident is not affirmative evidence from which a rational jury could have concluded that Martinez acted recklessly in conscious disregard of an unjustifiable risk that his conduct would cause his mother's death, and Martinez's reliance on her testimony is misplaced as it does not support his position that a manslaughter instruction was warranted.

**B. Martinez's statements that he had not planned to murder his mother, that the murder just happened, and that he could not take back his actions did not refute the evidence that Martinez acted knowingly or intentionally when he caused his mother's death and were merely expressions of regret that failed to show that he was reckless when he discharged the gun.**

Martinez also relies on Detective Arias' testimony that in his video-recorded statement, Martinez claimed that he had not planned to shoot his mother, that the shooting had just happened, and that he could not take back his actions. *See*

21

(appellant's brief:18).[4]  As with Paniagua's testimony, Martinez's statements reflecting that he had not intended to kill his mother "cannot be plucked out of the record and examined in a vacuum."  *See Godsey*, 719 S.W.2d at 584.  Rather, the entire record, specifically Martinez's video-recorded statement, must be reviewed in order to determine whether the record contains any affirmative evidence that Martinez did not in fact intentionally or knowingly cause his mother's death.  *See Mathis v. State*, 67 S.W.3d 918, 926 (Tex.Crim.App. 2002).

Here, a review of the record shows that there was substantial evidence that Martinez intentionally and knowingly caused his mother's death.  Primarily, a review of Martinez's video-recorded statement reflects that Martinez initially tried to implicate Peralta as somehow being involved in his mother's murder by claiming that Peralta had been with him when he got to the Motel 6 and asking how it was that Peralta had not been caught.  (SX134, 4:20, 5:36).  He then recounted that he and his mother had an on-and-off argument regarding his drinking and that they had argued about his drinking the day of the murder. (SX134, 10:33, 11:15).  After they argued, he left her home with Peralta's gun and went to a nearby truck stop to watch the Super Bowl game.  (SX134, 18:24).

---

[4] Although Detective Arias agreed that Martinez said these things towards the end of his video-recorded statement, a review of the conclusion of his statement actually shows that after Martinez was asked, "so once you were sitting there, the nagging started–right there you had already decided that you were going to do that?"  (SX134, 38:10).  Martinez responded, "I mean, I didn't decide it.  It just happened.  I just couldn't hold back.  I don't know.  It's weird." (SX134, 38:17).  However, in another part of his statement, Martinez did state that he had not planned to murder his mother and that there was no going back.  (SX134, 13:11, 30:44).

When he returned to her home later that evening, he stood outside undetected and watched her for about half-an-hour. (SX134, 19:07). He then went into the house, and his mother began "nagging" him as "always." (SX134, 38:22). His mother then got on her cell phone, and after she hung up and was about to make another call, he asked to borrow it as "a decoy" to get her off of the phone. (SX134, 23:24, 37:00). Gonzalez handed him the cell phone, asked him not to be long, and walked to her bedroom. (SX134, 23:26). He admitted that he followed his mother to her bedroom with the cocked and loaded gun, and when she got to her bedroom, she turned around and was about to say something to him, but "not no more," as he shot her in the face from where he was standing in the hallway. (SX134, 23:58, 25:05). He and his mother were the only people at the house when he shot her. (SX134, 31:37). When he was asked what had caused him to explode, Martinez first stated that he did not know, as he kept replaying what had happened, but then said, "I guess I just got there knowing what I was going to do, you know." (SX134, 19:21-20:08).

As such, Martinez's statement detailing that he lied in wait watching his mother's every move, concocted a way to get her off the phone, took a gun he knew was loaded and shot her in the face, then fled the scene and called Paniagua to tell her that he could not believe that he had shot his mother does not rationally support an inference that Martinez recklessly caused his mother's death. Instead, it

23

shows that he had knowledge of his actions and their result. *See Cavazos*, 382 S.W.3d at 384 (stating that "specific intent to kill may be inferred from the use of a deadly weapon"); *Brown*, 2014 WL 3747234 at *6 (holding that appellant's admission to her daughter and to the police that she shot the victim and killed her boss indicated her knowledge of her actions and their result).

Additionally, there is no evidence directly germane to recklessness because the statements that Martinez asserts entitled him to the manslaughter instruction amount to nothing more than expressions of regret and are not sufficient evidence that would permit a jury to find that if Martinez was guilty, he was only guilty of manslaughter. *See Cantu v. State*, No. 04-07-00330-CR, 2008 WL 372506 at *3 (Tex.App.-San Antonio Aug. 20, 2008, pet. ref'd)(not designated for publication)(holding that appellant's statements made after he shot and killed his girlfriend, that he had done something stupid, that he thought he had killed his girlfriend, and that he had not meant to do it, were expressions of regret and not sufficient evidence that appellant recklessly discharged the gun or was unable to perceive the risk created by his conduct); *Keller v. State*, No. 03-13-00501-CR, 2014 WL 6617143 at *7 (Tex.App.-Austin Nov. 20, 2014, no pet.)(not designated for publication)(holding that statements of the defendant, charged with shooting and murdering victim, that the shooting was a mistake and that he should not have shot the victim, are evidence of remorseful feelings, not a reckless act).

Thus, Martinez's request for a manslaughter instruction was not supported by the statements he relies upon because they do not refute the evidence that he knowingly or intentionally caused his mother's death and do not show that he acted recklessly when he discharged the gun.

### C. Dr. Contin's testimony regarding the manner in which homicide may be charged does not support Martinez's request for a manslaughter instruction as it does not suggest that Martinez acted recklessly when he shot his mother.

Martinez also relies on Dr. Contin's testimony that homicide can result in a charge of murder, manslaughter, or criminally negligent homicide to support his argument that there was some evidence that his act of shooting his mother was reckless. *See* (appellant's brief:18). Here, Dr. Contin simply agreed with defense counsel's question asking whether homicide could result in three different charges that take into account an individual's mental state. (RR4:28). As such, Dr. Contin was only answering an abstract question and did not state that Martinez acted recklessly when he discharged the gun or make any statement during his testimony that would have supported that finding. *See Brown*, 2014 WL 3747234 at *6 (holding that medical examiner's statement that shooting a person was considered to be an act of reckless endangerment did not constitute some evidence that appellant was merely reckless, where the medical examiner was answering an abstract question, and did not state that appellant only committed an act of reckless endangerment).

25

As such, Dr. Contin's testimony does not support Martinez's request for a manslaughter instruction.

## III. Conclusion

Based on the foregoing, the evidence Martinez relies upon does not directly raise manslaughter as a valid, rational alternative to murder because it failed to show that he recklessly disregarded a known risk. That is, that at the time that he fired the gun, that he was aware of, but consciously disregarded, a substantial and unjustifiable risk that his mother would die as a result of his conduct. *See Gilbert*, 196 S.W.3d at 165-66 (holding that neither appellant's denial that he intended to kill the victim nor his claim that the shooting was an accident established that appellant was reckless in having discharged the gun). Rather, a review of the entire record shows that he intentionally or knowingly caused his mother's death by taking the cocked and loaded gun, pointing it at his mother, and shooting her in the face before she could say anything else to him. *See Sanchez v. State*, No. 05-05-01118-CR, 2006 WL 2709528 at *4 (Tex.App.-Dallas June 6, 2007, pet. ref'd)(not designated for publication)(holding that the evidence did not raise the lesser-included offense of manslaughter where the evidence showed that appellant got his shotgun, pointed it at the deceased, and shot her in the back of the head at close range). As such, Martinez was not entitled to a jury-charge instruction on the lesser-included offense of manslaughter, and his sole issue should be overruled.

26

## PRAYER

WHEREFORE, the State prays that appellant's conviction and sentence be affirmed.

Respectfully submitted,
JAIME ESPARZA
DISTRICT ATTORNEY
34th JUDICIAL DISTRICT

/s/ Rebecca Estrada Quinn
REBECCA ESTRADA QUINN
ASST. DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
EL PASO COUNTY COURTHOUSE
500 E. SAN ANTONIO
EL PASO, TEXAS 79901
(915) 546-2059 ext. 3070
FAX (915) 533-5520
E-MAIL: rebquinn@epcounty.com
SBN 00787444

## CERTIFICATE OF COMPLIANCE

The undersigned does hereby certify that the foregoing document contains 7,222 words.

/s/ Rebecca Estrada Quinn
REBECCA ESTRADA QUINN

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the above motion was sent via the e-file system on May 29, 2018 to Ruben Morales, rbnpmrls@gmail.com and Mateo DeKoatz, mateodekoatz@yahoo.com, attorneys for appellant, 718 Myrtle, El Paso, Texas, 79901.

/s/ Rebecca Estrada Quinn
REBECC A ESTRADA QUINN

27